Counsel, you may proceed. May it please the Court, my name is Colleen Christensen, representing the appellant Robert Goodstein as the receiver for certain Stern Co. partnerships. I do hope and trust that Your Honors received the supplemental authority that we submitted yesterday based on a Court of Appeals decision that was handed down last week. I faxed it and it's been submitted in original form today based on the clerk's directions. That case — Is it a mutual venum, Paul? Yes. Versus USFIC. All right. And what do you — what's your assertion? What do you say it means? What the case does is clarify what the Court meant in Unigard v. Levin, and it refers to what it calls a — the benefit of a late tender rule, meaning that if — Can I back up for a minute on the duty to defend? I'm a little baffled by what it is that you're claiming. In this instance, you essentially said there was no claim at one point. And then in 1998, you — let's say a claim was made then, and let's say it encompassed the duty to defend. So what are you looking for? You're looking for — there wasn't a lawsuit or a proceeding. What are you looking for in terms of the duty to defend? What are you asking for? Well, as an environmental claim, under Washington law, we would be entitled to the investigative costs that the receiver incurred for purposes of an — So that's what this is about. That's what the duty to defend is. That's what the duty to defend is about. You're not asking — and this is what I want to clarify. In the guise of the duty to defend, for any consequential damages linking up to the loss, the — the decrease in the price of the sale. Actually, Your Honor, it would not be consequential damages, but rather as a — You're asking for — as an indemnity, but you're not asking that as part of the duty to defend. That's all I'm trying to clarify. Well, it's a little — it's a little tricky, because I have to say that the trial court did it backwards. In other words, that court looked at the duty to indemnify and then — which is a narrower task — and then looked at the duty to defend. Now, let's assume that's true. I'm just trying to clarify it. And the duty to defend, if the insurer breached the duty to defend, we would be entitled to the settlement of the claim, whatever — But that's the part I'm having a real problem with, given the timing. In other words, the claim on the duty to defend was late, and even though you had said earlier you weren't going to make the claim, that absent prejudice, they have to pay you the actual defense costs. But doesn't it also have to be that any consequential damages or damages for the whole settlement have to be because somebody breached something they should have done, and there's no argument that they — no sense to me to the notion that they should have — that you were any worse off for them not having paid something you haven't asked them to pay. In other words, that they didn't cause you to enter into the settlement or to sell it off rather than cleaning up, because you never asked them to pay anything. Your Honor, actually, the issue here was that there were several insurers who were provided with the same notice that industrial indemnity received. And in that notice, it says, we are not making formal claim at this time. We're providing you notice of potential liability against us by the DOE. That's kind of an awkward way to do it. Don't most lawyers know how to invoke the duty-to-defend clause? Actually, Your Honor, if someone who's practiced in this area for 17 years or whatever, there are all kinds of ways that people invoke it. And that's the question of what's going to happen here. Is this Court going to set a rule for how the duty-to-defend should be? No. But here we have an additional fact, which is they wrote a letter and said, we are not making a claim. They didn't simply make a poor claim. They said, we are not making one. Actually, the language was, we are not presently making a claim. Right. And I'd like to refer the Court to some of the facts. We are simply asking to obtain copies of any policies relating to insurance provided by the de Sterno. That's right. And a few months later, on January 31st, 1991, this is at the Exhibit Record of 147 and 148, at the conclusion of a letter from Industrial Indemnity to the same lawyer, the paragraph states, it is emphasized that our providing this material to you in no way concedes any degree of coverage. This issue of coverage will be addressed in subsequent correspondence. So that letter shows that there was no reliance on the statement Mr. Smith said about not presently making a claim. But my point, the part that I am concerned about, is there also appears to have been no reliance by the receiver or by his predecessor on the failure to pay defense costs, because he never asked for any defense costs. Actually, the – this is also a historical issue. Back in early – in 90, the Boeing case had just come down. There had not been a lot of cases about what the duty to defend or PRP claim meant. And later, other courts decided that, in fact, it meant investigative costs. It meant defense counsel's fees for negotiating with the DOE or the EPA. And, in fact, in 1995, the Washington Insurance Commissioner adopted a regulation that specifically stated it is bad faith for an insurer to deny those investigative costs as part of the duty to defend. Did anybody ever deny investigative costs? Was they ever asked to pay any? The – they were all provided notice. There is – there is no – if I may submit, there is no obligation in the policy that requires an insurer to say in certain words, magic words, please provide a defense of this claim. The only thing that the insurer said was to say, we're not making a claim. It said, we are not presently making a claim. And what that did, giving notice of a potential claim under both the common law of Washington and the WAC provisions, the Washington Administrative Code, that put the insurer on notice that it should investigate. There was admittedly some ambiguity in what the insured was saying in those two letters. Other insurers took the first letter and ran with it. There is in the record the signature response. I guess I'm making a slightly different point. Let's assume that the – that the insurer should have investigated. But insofar as you are claiming damage is linked to the duty to defend rather than directly to the duty to indemnify, with regard to what you're calling a settlement – and we can get into that later, whether it's a settlement – doesn't there have to be some causation? Some way in which the – a breach by the insurer led to a, quote, settlement that wouldn't have otherwise occurred? In this claim, and there's testimony by Mr. Goodstein, it was his belief that the insurers were acting in a monolithic way. There were several insurers on notice, all of whom were sued in this particular case, and their names are on the caption in the underlying pleadings. They – some of them telephoned and asked questions. Some of them wrote letters and asked questions. Some of them said they'd looked at the DOE file. Some of them did all kinds of things. Not a single one accepted the defense. Not a single one accepted the indemnity. Under those circumstances, he believed he was free to go forward and settle the claim of the DOE as he felt. First of all, how did he settle the claim? He did not, in fact, settle the claim, as far as I understand it. And this I'm confused about, too. I gather that the Department of Ecology, which is what we're talking about, the Washington Department of Ecology, can still go back to the receiver and the estate and say you owe us clean-up costs. Is that right? Well, theoretically, yes. But actually what happened was, in the agreement between the purchaser and the seller, between the receiver and purchaser Zellman, it obligated Zellman to clean up the I saw that there was an obligation not to require the seller to clean up. But I didn't see anywhere that there was an obligation on the part of the buyer to clean up. And, in fact, it's my understanding that, as with regard to one of the two properties, they haven't cleaned up. I believe that in the Let me just see if I can find the record. I will, on rebuttal, be able to provide that with you. But there was an obligation, and that was part of it. There was no question that the receiver had liability for the environmental clean-up. That was in the court records, the receivership records. The court acknowledged that there was joint and several liability of all the part of the receiver. But it seems to me to be very important whether they essentially sold both an as-is property and an obligation to clean up, and I couldn't find that. So maybe you could show me where it is. I certainly will try to. But getting to the other point, let's assume for the sake of argument that there's no breach of the duty to defend, and I'm not conceding that. There is also a desire and a need to look at the duty to avail liability. Kagan. There may be a breach of the duty to defend in the sense that they now owe you at least the investigative costs. But that's different from the question of what does that lead to. Right. Right. All right. And when I say – when I was talking about investigating before, I wasn't talking about some of the arguments that were made at the trial level. The argument is, if there's some ambiguity in what the insured is saying, and there's testimony in the record that there was ambiguity and that typically industrial indemnity would have asked, are you seeking a defense? When there's an ambiguity about that, it's industrial indemnity's obligation to seek to investigate that and say, is this over? Is this claim dead? What are you doing? And if you look at the record, in 1992, the claim file says, we're closing the claim because the letter of September doesn't make a formal claim. It doesn't mention the letter of October 22nd, which is the one that everyone's referring to. It mentions a letter that everyone else took, every other insurer took, as asserting notification of a claim. And whether the – there should be no magic words. It should never say, we are hereby asking you to defend and do everything possible. It should simply be notification that there's a liability claim against the insured. Kagan. Kagan. Other insurers get a letter saying, we're not presently making a claim? I don't know. What I do know is that three days after the letter of October 22nd, you'll see in the record, Cigna had a telephone conversation with John Smith, Mr. Smith, and he said – you know, he was asked about a lot of information, and they had a follow-up and provided additional information. I think what happened was there was no set dollar figure for anyone to submit. The investigation had not been completed. The remediation had not been chosen. And I think the term claim of – claim was a term of art that everyone was using in different ways. And to clear up that ambiguity, it's the insurer's obligation. It should not be on the insured to clear up whether a claim is going to be made. And there was no definitive statement by the insured. And, in fact, in the record from the letter I mentioned from January of 1991, as well as in the December 14th, 1992 statement from the insurance company, it's only a lack of correspondence that troubles the insurer there. It's not the definitive statement that there is no claim being made. This is nothing like the Mitchell v. McClaw case that I just submitted to you, or the DeWitt case, where the insured in that case didn't provide notice of the first claim. The only obligation is to provide notice. And there's an obligation on the insurance company, then, to respond and to investigate. Now, turning to the settlement issue, there – the Court, as I said, seemed to have done it backwards and decided that there was no duty to indemnify. It would really be helpful if you could show me where in the settlement, in the sales agreements, there is an agreement to clean up the property. On page 174. One what? It states, Buyer and seller acknowledge that buyer will be required to perform some remedial action in order to be able to develop the property. All right. If they just – if they develop the property, they will have to clean it up. The only way to use the property was to – Apparently, one of the properties has been sitting there for 10 years undeveloped. Is that not right? It was. But the property, I mean, you couldn't do – it was frozen by what the government was requiring to be done. Right. But there's no obligation set by these agreements to clean up the property. There's a recognition that if you're going to develop it, you're going to have to clean it up. But there's no obligation to develop it or to clean it up. Well, the DOE had already obligated the receiver to clean it up. Now, let me state that if – if the receiver had said to the insurance companies, we're about to enter into this agreement, the question is would they have objected to that. And that's a question of prejudice and whether they could show actual and substantial prejudice. And that's going to be their obligation. What exactly had the DOE done? The DOE – Did they – did they ever designate the seller or the receiver or the owner of the It's called a PERP under Federal law. I guess it's called a PLP under State law. Yes. The DOE had designated this a number one under the site rankings. The site. But did they ever say, and you – you have to clean it up? Well, that is implied by the ownership and all the environmental laws. And, in fact, again, if you look at the WAC regulations from 1995, it says that the – it shall be deemed bad faith for an insurer to deny that there's property damage when an insurer is faced with this kind of ranking on its own property. And there's in the record a statement about the – the ranking that the DOE issued. So there was – there was liability. That was admitted by industrial indemnity. In fact – And clearly, the – the sales agreements provided that if the receiver or the external should ever have to pay anything for clean-up, they would be held harmless and the seller would have to – the buyer would have to pay it. That much is clear. That's right. And it could have been worded – frankly, it could have been worded differently. It would have been nice. But the failure to do the form perfectly is not something that Washington courts usually impose on the insurer. In other words, it's always a question of was there prejudice to the insurer from what happened. Here, there was liability. There was an occurrence. There was – But to me, the question is, at least in part, whether it's sort of a public policy question, whether recognizing liability by the insurer with regard to the decrease in the sales price is going to get this cleaned up. And it doesn't appear that it is, because there doesn't appear to be any obligation to actually do the clean-up as opposed to repay the seller if the seller ever has to pay for the clean-up. Well, the RFIS had already been provided to the DOE. The receiver had been in negotiations with the DOE. There had been no question that this property was going to have to be cleaned up. That was – that was part of it. The question was, is the receiver and the group of partners able to do the clean-up prior to the – As of this moment, has anybody paid for a clean-up for one of the properties? Yes. Absolutely. For both of the properties? For – not for the marginal-weight property. So as to one of the properties, nobody has, at this moment, has paid for a clean-up. There's still an obligation. And under Washington law, again, under the Weyerhaeuser case, the minute the DOE puts you on a list or tells you you're a PRP, that is considered the kind of obligation that triggers an insurance policy. And I think I'll reserve the rest of my time. You may do so, counsel. We'll hear from the insurance company. You may proceed, counsel. Thank you, Your Honors. May it please the Court. My name is Dave Shagle. I represent Industrial Indemnity Insurance Company, also sometimes called in the papers U.S. Fire Insurance Company, but it's the same thing. I'd like to start with the language of the policy. And actually, I'd like to start a little before that.  It's very unique to Washington. Washington is a State, and, of course, this is a diversity case involving Washington law. It's a State that places great weight on the actual language of the policy. We have rejected in Washington the reasonable expectations doctrine that allows the Court to depart from the language of the policy if it's inconsistent with the reasonable expectations of the insured. We've also rejected in Washington, to a very large extent, the argument that public policy ought to be allowed to change the policy terms. We only allow that if there's a specific State statute, and the only time that's ever been done is in the situation of automobile uninsured motorist coverage. So Washington does enforce the plain language of the policy, and they do so pretty rigorously. We have cases in which we have one case in which the difference between the and an determined the coverage outcome. We actually have another case in which the placement of a comma determined the coverage outcome. So it's very important under Washington law to look at the actual policy language. And that's why I'd suggest that we turn first to that language. And I've handed up a sheet there. Kennedy. When you were emphasizing the Washington authorities, are you suggesting that perhaps we should certify this question to the Washington Supreme Court? I wondered about that, Your Honor, whether that question might be asked. And I think the Washington law is clear enough here that there's no need for that. I don't think it's a unique question. I think if there were a split of authority among the States, that might be appropriate. This is an issue that doesn't get litigated very often, and I assume it's because not many people try to make a claim on a liability policy for diminution in value of property that they've sold. And to put another cast on it, though, what they are essentially saying is, I mean, Washington law has not been all that language-based as to this particular issue. We have Boeing and we have Weyerhaeuser, which certainly are at least something of a stretch of the policy language. So this may be an area in which the fidelity to language is worth less than in others. What do you have to say about that? I'd say that in both those cases, Your Honor, and both of those cases were cases that I argued to the Washington Supreme Court. I lost both of them, I might add. I think the Court, in all the questions I got from the Court in the opinion, still stuck to the specific policy language. They may have adopted an interpretation of the language that was pretty favorable to the insured. They may have picked the dictionary definition. But the one thing that's clear is that the damages do not have to mean paying a third party, because at least not paying the claimant, because that's not what happened in Boeing. And they also don't require there being a prior actual lawsuit or administrative proceeding, because that's what Weyerhaeuser held, right? At least those two things are true. Your Honor, I'd say that the second one is absolutely correct. As to the first one, I think there does have to be a payment to the third party. It doesn't necessarily need to be the claimant, the government. What the Boeing case said is it's okay if that payment is to the contractor. So then the question is, isn't this simply, or is this simply, an interpretation of an agreement, like that says, we are contracting with you, the buyer, A, to have our property, and B, to be the cleaner-upper? So instead of having a bunch of contractors to do the cleaner-upping, we're, as a set-off, to go back to our earlier case, essentially giving this, paying you to clean it up. I think that's a really interesting question, Your Honor. I think it raises two points, and I'm not going to answer your question directly. I just want to get into those two points. The first, I think, aspect of your question is, do the contracts really say that? And it's our view that they don't. They simply say, if you, the buyer, clean the property up, which you may well have to do if you want to develop it, then you've got to indemnify the seller, you've got to pay all the costs, so forth. No obligation for the buyer to actually do that. Suppose it had been written otherwise. Suppose it had said quite distinctly, here, we are selling you, A, the property on the condition that you clean it up. Well, I think that would certainly be the case. Taking a set-off on that land, and that's why the price is what it is. I think that would be a closer case than the one we have now. But I think that the insurers would still prevail because of the second point. And the second point is that I believe that the courts will find both the policy language and the basic nature of this policy, which is a liability policy, just simply precludes payments to the insurer. I mean, one way to look at Your Honor's question is, aren't the insurers here elevating form over substance? Why not, if the substance is going to be the cleanup of the property, who cares whether or not it's done as one of the terms of a contract of sale of the property or by direct payments to a contractor or to a government agency, the latter of which is going to be allowed under the policy? The point I'd make on that is, first of all, form does matter because of the policy language. The policy language says the insurer will pay on behalf of the insured. It also says it will only pay amounts the insured legally becomes obligated to pay as damages. And the Boeing case itself defined damages as, let me just read this, a claim which results in causing the policyholder to pay sums of money because his acts or omissions adversely would affect the rights of third parties. Now, why is this emphasis on paying sums of money important? And obviously, that's you could see that as somewhat of a detail, that why is paying money different than receiving less money? I think it's important because of the very critical distinction in insurance between third-party liability policies and first-party property policies. It doesn't make a lot of sense, though. I mean, you're saying that if the so let's take another structure. Suppose the structure was we're going to sell it to you for full price, and then we're going to pay you X amount of money to clean it up. That would be different. I think that if there were separate contracts, and if the payment were a separate payment, then there would be a much stronger argument here. Now, we obviously have lots of other coverage issues in this case, but just on this one, I think it would be different. And so I get back to the question is why does this form matter? And the reason the form matters is because when you convert, when you think about converting a policy from a policy that pays the insured's liability to a third party to paying the insured themselves, it's a whole different ball of wax. Then, all of a sudden, you no longer have the situation where the insured and the insurer have the same interest to minimize their liability. A liability policy is protecting the insured against judgments or amounts the insured has to pay to third parties. Both the insurer and the insured have a strong desire in keeping those amounts low and in properly defending themselves. When you turn that into a policy that says we are going to pay the insured money, then you have a whole different situation. Then, all of a sudden, the insured's incentive is no longer to keep the amount of the judgment low. It's to make it as high as possible because the money is coming to the insured. And this is recognized. It's recognized as a basic distinction that courts have got to honor. And that's why this difference is an important one. But presumably, you would have some means to contest whether the amount of money that they're claiming represented a diminution in value was legitimate or not legitimate. We sure would. But that's a much more difficult task, and it was a task that we were facing. There was a five-month period in this case between the time that this issue was briefed and the oral argument. We were doing discovery on exactly that issue. And it's very difficult, as you can imagine, to be having arguments with competing property appraisers about how much was the property really worth. I mean, there's a real question about can this property even be valued. It was the only undeveloped 45-acre parcel of property. It's right south of the Ikea store down south of Brenton. It was also a property that had a giant pile of, for lack of a better term, garbage the size of two football fields and 30 feet high that had to be disposed of. And so there are lots of difficult issues with valuation. It was also a property, by the way, that had some lowlands and wetlands that had to be filled. One of the issues, if this case were to be remanded, that the insurer would then be forced to fight about would be, well, did they really spend more to clean up this property versus what they would have had to do anyway to fill the low areas. Because what they ended up doing is they took this giant pile of garbage, they mixed it with concrete, they dug a hole, and they put it in the hole, and then they built stores and warehouses and things on top of it. So if you convert this policy from a liability policy to a first-party property policy, you then face the problem, or the insurer then faces the problem, a much more difficult claim of having to determine what is the value, if there is any, of this liability component, if you will, of this payment to the insured. You don't have that problem, of course, in a liability policy. If there's a judgment against the insured, everyone knows the amount of the issue. Kagan. No. See, in the environmental area, there isn't necessarily a judgment against the insured. No. But there are bills from the cleanup contractors, and you know how much they are. And I've litigated these issues for years and usually damages issues. But the exact problem that you just pointed to could arise in that instance. In other words, they could have kept the property, paid somebody to clean it up by digging the hole and put the garbage in, and you could say, ah, but they were really just doing it. They really weren't doing it for cleanup purposes. They were doing it in order to develop the land. The exact problem would exist, right? A similar problem could occur, but I'd suggest it's more severe here, because not only do we have the problem of determining what's really a cleanup cost and what isn't, we also have the problem that all of this is being done by a third party. It's no longer the insured. Really, the measure of damages the insured is claiming as a, quote, unquote, damage is at the point of sale. They're saying, well, we got $3 million for this property. We think based on an appraisal, which, by the way, was four years old at the time of the sale, that we should have gotten $7 million. Can I ask you something? Certainly. Let's suppose instead they had sold it at full price. Could they at that point have the insurance coverage have gone with it, or could it have gone with it by way of assignment with regard to any obligation to clean up? Interesting question. Of course, it did. The contract specifically says it stays here. Could it have? Would it have? There is an anti-assignment clause in the policy, but there are also court decisions that say that once a claim becomes clear, once it becomes a chosen action, then that anti-assignment clause is ineffective because it doesn't matter to the insurer who is enforcing the claim. So the claim is freely assignable. In the case of an ongoing pollution cleanup, that's a problem because it may be freely assignable as to the expenses that have been incurred or obligations that have been incurred prior to the time of sale, but not after, and that's an uncertain area. So the answer is maybe. It could be that the insurance obligation could have gone along with the sale if the sale had not been at a reduced price. That's right. I think it could have. There might be an issue, but I think at least to a large extent, it could have. Now, that brings up an issue that I think we need to address. I was going to say, you've indicated, of course, you don't look at the 1990 letter as constituting a claim. To the extent there is a claim as such in this case, what is it? When was it made and for how much? It hasn't been made yet. But they've reserved the right to make the claim. They've repeatedly said, if someday the Department of Ecology or someone else comes after us, Sternoff, we fully intend to make our claim for coverage against this liability. And would you recognize that claim or would you say it was too late? I think if the claim, the law is clear that if the claim is being made recently, they may have a very good argument that they thought they were going to be indemnified and what if these buyers for some reason don't have the money to indemnify them and all of a sudden they gain the reasonable belief that they're going to be personally liable, I think they could make a claim. And it's very important to point out that every time that they've made a demand against us, they've been very clear to say, now, this is not a substitute for the real insurance claim we may make someday at some point in the future. We want to make clear that we're still retaining the option to make that claim if and when the need arises to do so. And we still are under potential obligation to that claim. And the 1998 letter wasn't a claim? I'm sorry. The 1998 letter was not a claim at that point? The 1998 letter said, we've now determined that we made only $3 million instead of $7 million. Please send us a check for $5.3 million. So in that sense, it certainly was a claim. It was a claim for a diminution in value from the property, which we believe isn't covered. But what I'm saying is if someday they make a claim that does have the potential to be covered, like for example, despite everything that's gone on, the Department of Justice is still going after us for this pollution that we caused on our property while your policy was in effect, then I think we'd have an obligation to cover that. What about the duty to defend? You haven't really addressed that directly. Yeah. I'd like to address that. I think, frankly, the duty to defend issue is a red herring here for a couple of reasons. First of all, the district court found, as a matter of law, based on what she believed were undisputed facts, that there's no duty to defend. She found that for, I think, the reasons the Court is very well aware, that on October 22nd of 1990, a letter was sent to the insurer saying, in case there is any confusion, we are not presently making any claim under these policies. And this issue has actually been addressed. But in 1998, they asked they made some sort of a claim that it seemed to encompass a duty to defend, or at least their cause of action, the complaint in this case seemed to encompass a duty to defend. And at some point, they made a claim that you, for at least the defense costs. Actually, they didn't, Your Honor. If you look at the 1998 letter, and it's in the record at the record 186, it's pretty clear it doesn't mention anything about defense costs. It itemizes claim damages, which do not include any alleged defense costs. They are limited to this diminution in value, the difference in value between the alleged fair market value of the property and the actual sales prices. In fact, the first time that any suggestion was ever made that the insurer should have paid defense costs was after we filed our summary judgment motion in the opposition brief. We read that 15 years earlier, we should have been paying defense costs. But it's in the complaint. It is in the complaint in this case. I'm not sure whether it is in the complaint. Yeah. There is some reference to a duty to defend in the complaint. There may well be. The first time I understood that there was anything that we were being asked to defend was when I received our opposition. Well, suppose they wrote you a letter tomorrow and said, this is how much it cost us to get all these studies done. We want the money. Back in 1990? Well, I think that's answered by the Unigard v. Levin case. It's a 1999 Washington court of appeals decision. And it says an insurer cannot be expected to anticipate when or if an insured will make a claim for coverage. The insurer, sure read, must affirmatively inform the insurer that its participation is desired. The claim the case goes on to say, and doing so 15 years later, in that case it was about 7 years later, when you file your complaint, can't create an obligation on the part of the insurer to pay those defense costs years and years ago. So my position --- New Artharia, which they say in their case, which they say, and they seem to be right, does interpret that as not necessarily meaning that there's not an obligation to pay defense costs. I know it was a contribution case, but it certainly suggests that that the obligation to pay the defense costs doesn't wash because no specific demand was made. What's your response to the Mutual Venum Clause versus USF case? Your Honor, that case has to do with a --- it's really the mirror image, the opposite of this case. That has to do with the situation where the insurer is saying, a claim is covered by our policy, but we believe that we should not have to pay that claim because of the insurer's misconduct in giving us late notice. And the Court then, I think appropriately, applies a pretty strict standard and says, in order for you to void all coverage under the policy, including coverage that you agree exists, you've got to meet the standard that shows reliance and all of these other factors. And I don't think in any way that the --- But why doesn't that apply? I'm leaving aside now any claim that this morphs into an obligation to pay the diminution in value, but simply for the cost of doing the studies that were triggered, as I understand it, by the DOE's designation, which you would have --- there's no doubt that you would have had to pay that had they made a timely claim. Why don't you have to pay it? I think under the current law, we would have probably had to pay some of them. I think there could be an argument about part of --- I think they had a study by an environmental engineer. They also had a --- they also had an appraiser. And there's a current case that says if the DOE has written an adversarial-like demand, then there's a duty to defend. I think there might be an issue about whether at that point there was an adversarial-like demand, because as I understand it, and this is not an issue that's before the Court, so I'm a little foggy, but as I understand it, this site appeared on a list of properties, but the insured had never actually gotten a letter saying, we, the State, demand that you do this, this, and this. It certainly was on a list that the State was looking at, but there may well be a question under Washington law about whether a duty to defend had actually arisen at that time. But that could be litigated on remand if we were to conclude, A, that the district court was wrong in saying that the duty to defend went away because of the duty to indemnify, and, B, that there was no lateness problem as such, on just on the cost as opposed to anything else. It could, Your Honor. That's right. That's right. One other thing I'll point out is even the States, and I believe that Unigard v. Levin is still good law because the USFA, excuse me, the mutual lien of claught case, I think, only relates to this question of can the insurer defeat all coverage due to late notice. But even if it weren't, even the cases that require or that have a looser standard for when the defense is asked still say if the request is later withdrawn, you can't then years later say the insurer acted improperly because they weren't paying us defense costs when we told them we didn't want them to. Thank you, counsel. Your time has expired. Ms. Christensen, you have reserved some time. Your Honor, there is no evidence of the withdrawal of the claim. If you look at the record with regard to the communications that followed, industrial indemnity considered it a potential claim, and it never clarified what was happening. The only excuse it gave to itself internally in 1992 was that it had received no further communications from the insurer. And again, if you compare that to what happened with Cigna, Cigna was in constant communication asking questions of the insurer at any time industrial indemnity could have asked, are you disclaiming this? Are you walking away from this policy? Why did you give us this notice? Are you walking away from any claim under the policy? Well, you heard Mr. Shagel say that as far as he's concerned as a matter of law, there is no pending claim in this case. There could be a claim filed later on, which you may want to protect yourself on. But what's your response? Well, there is a claim for duty to defend. The duty to defend. And what is that, and when was it made? And it arises at the time the DOE gave notice of potential liability status. And that was before the letter of 1990. And that includes the RAF cost. Okay, did you notify industrial indemnity of the DOE claim? Yes. That's in the first — In the 1990 letter? Yes, it is. There's a full — that the DOE has provided notice of a hazardous waste site. Was there a direct demand by DOE ever? Yes, there was. There was — there were constant negotiations. Under Washington law, the fact that it was ranked as a Level I site is enough to trigger the policy. So that was the — All right. Was there a letter — what is in the record about this? Okay. The record has the site form. It's Exhibit 131, and that's a marginal-wage site form. This was not in dispute, by the way, during the trial court decision. There was also the notice letters which stated that the properties were contaminated and identified as sites by the Washington State Department of Ecology Hazardous Waste Cleanup Program. And I might submit also that industrial indemnity continued to assert we were running away from liabilities. It assumed that there were, in fact, liabilities being made against the receiver.  And you asked Mr. Shagel whether there's law about whether the party who assumes a liability as a matter of law gets the insurance rights. And we cited the court to two cases, including the Ninth Circuit case. And the cross-assignment that we achieved that was in the record at the time — evidence was in the record at the time of the motion for summary judgment — permitted the insurance rights. So even if this court were to find that the settlement was not in a proper form, that cross-assignment permits the receiver. Thank you, counsel. Your time has expired. The case just argued will be submitted. All right. Thank you.
judges: O'scannlain, Tashima, Berzon